OPERATION ABLE OF GREATER
BOSTON, INC., Plaintiff,

v.

NATIONAL ABLE NETWORK,
INC., Defendant.

Civil Action No. 09–10947–NMG.

United States District Court,
D. Massachusetts.

Aug. 3, 2009.

Victor H. Polk, Jr., Greenberg Traurig LLP, Boston, MA, for Plaintiff.

Sarah Chapin Columbia, Hasan M. Rashid, Matthew E. Leno, McDermott, Will & Emery LLP, Boston, MA, for Defendant.

### MEMORANDUM & ORDER

GORTON, District Judge.

This is an action for trade name and service mark infringement. The plaintiff has moved for a preliminary injunction to preclude the defendant from using allegedly similar marks within the geographic area in which plaintiff operates.

### I. *Factual Background*

#### A. The Parties

Plaintiff, Operation ABLE of Greater Boston, Inc. ("Operation ABLE"), is a nonprofit organization that assists mature workers seeking to re-enter the job market in the Greater Boston, Massachusetts, region through job training and placement. Operation ABLE was founded in 1982, originally as a part of an organization called Careers For Later Years, and became an independent organization in 1990.

Operation ABLE is one of several nonprofit organizations that have historically provided similar career training services throughout the country. In addition to the plaintiff, two other organizations have used the word "able" as part of their name: Operation ABLE of Michigan and the defendant, National Able Network, Inc. ("National Able").

National Able was founded in 1966 and originally operated in Chicago, Illinois, under the name Operation ABLE, Inc. In 2004, the defendant changed its name from Operation ABLE, Inc. to National Able Network, Inc. and began expanding geographically beyond Chicago. According to the defendant, it changed its name for two reasons: 1) to reflect the organization's new business direction, namely, serving job seekers through multiple locations nationwide and 2) to avoid confusion with other Operation ABLE entities around the country (including the plaintiff). Like Operation ABLE, National Able's mission is to provide employment and training opportunities for older workers.

#### B. Use of the ABLE Mark

In 1983, the defendant (then operating as Operation ABLE, Inc.) filed a trademark application for "Operation ABLE" and obtained a federal registration of that mark in 1985. That registration was cancelled in 1991. In 2004, defendant registered the marks "National Able Network," "Able Career Institute" and a logo displaying "Able A!"

The plaintiff, Operation ABLE, asserts that it has been using the service marks "Operation ABLE" and "ABLE" continuously since 1985, although it has never registered those marks. Operation ABLE uses the ABLE mark as an acronym for

"Ability Based on Long Experience" but pronounces the mark like the two syllable word "able."

### C. The SCSEP Program

The Senior Community Service Employment Program ("SCSEP") is a program administered by the U.S. Department of Labor ("the DOL") which awards grants to non-profit organizations to subsidize employment opportunities for older workers. Grants are awarded both directly from the DOL to non-profits and to the states, which in turn issue grants to non-profits (i.e., organizations can potentially receive SCSEP funding from one or both sources).

Non-profit organizations, such as both parties in this case, administer the SCSEP program by 1) providing employment skills and 2) placing workers in jobs in the non-profit sector and subsidizing their wages. Some jobs involve working for the grantee organization itself. The DOL has promulgated detailed regulations governing the administration of SCSEP and the services to be provided.

### D. Operation ABLE and National Able's Collaboration

In 2003, National Able and Operation ABLE (along with two other organizations) applied jointly for, and received, a SCSEP grant from the DOL to deliver services in several Massachusetts communities (specifically, Norfolk and Middlesex counties). National Able was designated as the primary grantee but later entered into a subgrant agreement ("the Subgrant Agreement") with Operation ABLE whereby the plaintiff was commissioned to administer the grant for the designated Massachusetts communities. In 2006 the DOL renewed National Able's grant for

Essex and Middlesex counties and Operation ABLE again served as subgrantee.[1]

The original Subgrant Agreement entered into in 2003 provides:

> In the event the SUBGRANTEE makes any public announcements, written or oral, publicizes or furnishes any materials and/or information and/or concerning activities under this Subgrant, such item or activity shall include information that the project is funded by a Subgrant with [National Able Network, Inc.], with funding provided by the United States Department of Labor.

Later versions of the agreement included that same language but added the following:

> Use of the National Able Network, Inc. registered trademark and logo will be in accordance with standards approved and published by National Able Network, Inc.

In accordance with those requirements, plaintiff sent materials to participants displaying the names and logos of both Operation ABLE *and* National Able.

In 2008, National Able began renting office space in Massachusetts from Operation ABLE in connection with separate services provided under the DOL's Job Readiness Training ("JRT") program. That program serves the same participants as the SCSEP program but focuses on job training rather than placement. National Able has been using its name and logo in association with the JRT program operated in Boston.

### E. Conduct Giving Rise to the Litigation

On April 23, 2009, National Able notified Operation ABLE that it would not be re-

---

1. Operation ABLE asserts that, in addition to acting as subgrantee for National Able in Essex and Middlesex counties, it receives a separate SCSEP grant from the Commonwealth of Massachusetts and serves as the exclusive *state* SCSEP administrator in Essex, Suffolk and Worcester counties, and as one of two state administrators in Middlesex County.

newing the Subgrant Agreement, which was set to expire on June 30, 2009. National Able also sent letters to participants and training sites of the SCSEP program stating that, as of July 1, 2009, it would provide services directly rather than through Operation ABLE as a subcontract provider. The letter invited participants to voice any issues or concerns at a "Town Hall Meeting" to be held in the near future.

National Able contends that it declined to renew the Subgrant Agreement for two reasons: 1) to further its goal of providing direct services according to its own policies, procedures and standards for performance and efficiency and 2) because of certain inadequacies in Operation ABLE's performance. Operation ABLE responds that it was told that its performance was not an issue. It also asserts that the defendant subsequently attempted to recruit its professional staff to work at National Able and that it has posted a job listing seeking staff for its Massachusetts operations.

### F. Evidence of Confusion

In an affidavit, Joan Cirillo, Executive Director of Operation ABLE, asserts that at least 25 SCSEP participants were confused after receiving the letter from National Able informing them of the change in provider. The affidavit further states that some participants did not understand that National Able and Operation ABLE were separate organizations and instead believed that Operation ABLE had simply changed its name. Moreover, staff at various training sites were allegedly confused by National Able's "marketing and solicitation." The affidavit of Kathy McDermott,

an Operation ABLE employee working in Lowell, Massachusetts, states that some participants "thought the letter was from Operation ABLE, and it was just informing them of 'a name change'." [2]

## II. *Procedural History*

Plaintiff filed a complaint, asserting federal and state claims for trademark infringement and a claim pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A"), on June 4, 2009. On that same day it filed the pending motion for preliminary injunction along with supporting affidavits (but with no proposed injunction).

Shortly thereafter, the opposed the motion for preliminary injunction and answered the complaint. In its answer, the defendant asserts counterclaims for breach of contract, trademark infringement and unfair competition under Chapter 93A. It also asserts a number of affirmative defenses, including laches and acquiescence. Plaintiff submitted a reply and this Court heard oral argument on July 29, 2009.

## III. *Motion for Preliminary Injunction*

### A. Legal Standard

■ To obtain preliminary injunctive relief under Fed.R.Civ.P. 65, a movant must demonstrate

(1) a substantial likelihood of success on the merits,

(2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.

---

2. In a third affidavit, Linda Foote, another Operation ABLE employee, asserts that one participant told her that he "thought he was [already] working for ABLE." Foote has since indicated an intent to retract her affidavit in an apparent effort to remove herself from involvement with this litigation and thereby gain employment at National Able. Accordingly, this Court gives no weight to her assertions.

*Nieves–Márquez v. Puerto Rico,* 353 F.3d 108, 120 (1st Cir.2003) (citation omitted). In trademark cases, likelihood of success on the merits is of particular consequence because "resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 115 (1st Cir.2006) (citations omitted).

### B. Application

#### 1. Likelihood of Success on the Merits

■ To succeed on a claim for trademark infringement a plaintiff must show that 1) it has a protectable mark and 2) the defendant's use of that mark is to likely result in consumer confusion. *Id.* at 116. Here, the parties dispute plaintiff's likelihood of success on both prongs.

#### a. Protectable Mark

■ Although plaintiff's mark is unregistered, it is entitled to protection if it is distinctive. *See id.* Distinctiveness is a term of art in trademark law and is generally determined by reference to the following spectrum: 1) generic (least distinctive), 2) descriptive, 3) suggestive, 4) arbitrary and 5) fanciful (most distinctive). *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 12 (1st Cir.2008) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Marks that are suggestive (e.g., COPPERTONE), arbitrary (e.g., APPLE computers) or fanciful (e.g., EXXON) are considered inherently distinctive while generic marks are entitled to no protection. *See id.* at 12–14, 19–21 (finding "Duck Tour" to be generic). Descriptive marks are distinctive, and thus protectable, only if they acquire "secondary meaning" by "becom[ing] associated with a single commercial source." *See id.* at 13.

The marks Operation ABLE and ABLE, as used by an organization that provides training and placement to mature workers seeking to reenter the job market, are not generic because they do not merely designate what Operation ABLE's services are. *See id.* at 14 ("Rather than answering the question 'where do you come from?', a generic term merely explains 'what are you?' " (citation omitted)). Whether those marks are merely descriptive (requiring secondary meaning to be worthy of protection) or suggestive (and, thus, inherently distinctive) is a closer question. The First Circuit Court of Appeals has explained the distinction between those categories as follows:

A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of [services]. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the [services].

*Equine Techs., Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 544 (1st Cir.1995) (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1040 (D.C.Cir.1989)).

■ Here, the marks Operation ABLE and ABLE fit most comfortably into the category of suggestive marks. Although the term ABLE serves a dual purpose, both suggesting the ability of mature workers and functioning as an acronym for "Ability Based on Long Experience," the mark makes no direct reference to mature workers or job training and placement. With "imagination, thought and perception" one might connect the mark to the services that plaintiff provides, but the mark alone does not immediately convey the quality of those services. *See id.* at 544–45 (finding "Equine Technologies" to be suggestive of plaintiff's product, hoof pads for horses). Plaintiff has therefore demonstrated that it will likely prevail in showing that its marks are distinctive.

The defendant nevertheless asserts that this Court should focus only on the mark Operation ABLE in weighing the likelihood of confusion and not the mark ABLE in isolation. As grounds it asserts that plaintiff has proffered insufficient evidence that it uses ABLE apart from Operation in a source-identifying manner.

A careful review of the record reveals that, although often referred to as Operation ABLE, plaintiff frequently identifies itself, and is identified by others, as merely ABLE. For example, annual reports from 1985–1989 and 2008 repeatedly refer to the organization as ABLE. Several media reports (in the *Boston Herald* and other outlets) have also used the shorthand ABLE. Finally, plaintiff's website uses Operation ABLE and ABLE interchangeably.

Furthermore, as explained above, the mark ABLE is suggestive and thus inherently source-identifying. *See Boston Duck Tours,* 531 F.3d at 13 ("Marks classified as suggestive ... are all considered inherently distinctive because they have the capacity to serve a source-identifying function upon first use."). Accordingly, this Court finds that plaintiff has demonstrated a likelihood of success with respect to the protectability of both Operation ABLE and ABLE in isolation.[3]

### b. Acquiescence

Before proceeding to the likelihood of confusion, defendant's laches/acquiescence argument is appropriate for consideration. The defendant asserts that the plaintiff acquiesced in its use of the disputed marks by entering into, and acting in conformance with, the Subgrant Agreement that required Operation ABLE to include National Able's name and logo in all public announcements concerning its administration of the SCSEP program. Alternative-

ly, it asserts that the defense of laches applies because of plaintiff's delay in bringing suit.

### i. Legal Standards

Laches and acquiescence are affirmative defenses and therefore the defendant bears the burden of showing a likelihood of success with respect to both. Laches applies when a plaintiff's unreasonable delay in filing suit causes prejudice to the defendant. *Oliva v. Ramirez,* Civ. No. 07–1569, 2007 WL 2436305, at \*2 (D.P.R. Aug. 21, 2007) (citation omitted). Acquiescence is a related doctrine that denotes active, as opposed to passive, consent to use of a mark. *See Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.,* 934 F.2d 1551, 1558 (11th Cir.1991). Acquiescence requires a defendant to show that 1) the plaintiff actively represented that it would not assert a right or claim, 2) the delay between active representation and assertion of the right was not excusable and 3) the delay caused the defendant undue prejudice. *See Profitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy, P.C.,* 314 F.3d 62, 67 (2d Cir.2002) (Walker, C.J.); *Coach House Restaurant,* 934 F.2d at 1558.

The First Circuit has had little occasion to explore the contours of the doctrine of acquiescence. In looking to other jurisdictions for guidance, this Court finds the analysis of the Second Circuit Court of Appeals in *Profitness Physical Therapy Center v. Pro–Fit Orthopedic and Sports Physical Therapy, P.C.* to be particularly useful, as have other courts within this circuit. *See* 314 F.3d at 68–69; *see also Oliva,* 2007 WL 2436305, at \*2–3 (citing *Profitness* ); *Colt Defense LLC v. Bushmaster Firearms, Inc.,* No. 04–cv–240,

---

**3.** Defendant's evidence of other Massachusetts entities which use some variation of the word "Able" in their name is irrelevant because none of those organizations directly competes with plaintiff. *See Equine Techs.,* 68 F.3d at 547.

2005 WL 2293909, at \*34 (D.Me. Sept. 20, 2005) (same).

■ In *Profitness*, the Second Circuit explained that "[a]cquiescence does not extend to a use that has not yet materialized and is not foreseeable," and "a defendant may exceed the scope of the plaintiff's consent and be exposed to liability for ... extra-consensual use." 314 F.3d at 69; *see also Oliva*, 2007 WL 2436305, at \*3 (noting, with respect to laches, that defendant's use of the disputed marks should be measured "from the date that the defendant's acts first significantly impacted on plaintiff's goodwill and business reputation"). A "critical circumstance" bearing on the scope of plaintiff's acquiescence is the likelihood of confusion. *Profitness*, 314 F.3d at 69. That is, whether a new use increases the likelihood of confusion, thus suggesting that it exceeds the scope of plaintiff's consent. *See id.* (remanding to district court to determine whether defendant's expansion into Manhattan from Queens, New York, increased likelihood of confusion and exceeded scope of plaintiff's acquiescence).

#### ii. Application

■ Here, the defendant argues that the plaintiff acquiesced to its use of the disputed marks by entering into the Subgrant Agreement and thereafter including the defendant's name and logo (along with its own) on materials it distributed. The plaintiff also rented office space to the defendant for use in connection with its JRT program. The defendant uses the same name and logo in connection with that program. This Court concludes that those actions represent at least an implicit acquiescence to defendant's use of its marks. *See id.* at 68 (noting that "a plaintiff communicates active consent by conduct that amounts to an explicit or implicit assurance that plaintiff ... will not assert its trademark rights").

Defendant has also made an adequate showing of prejudice in that it 1) changed its name to National Able to avoid confusion and 2) has invested in that name in Massachusetts and elsewhere for more than five years.

This Court is not persuaded by the plaintiff's contention that defendant's right to use the marks was conditioned on it remaining "affiliated" with Operation ABLE. There was no formal affiliation between National Able and Operation ABLE but rather a simple contractual relationship. *Cf. U.S. Jaycees v. Phil. Jaycees*, 639 F.2d 134, 136 (3d Cir.1981) (local chapter of national organization had its charter revoked); *Am. ORT, Inc. v. ORT Israel*, No. 07–cv–2332, 2007 WL 2049733, at \*2 (S.D.N.Y. July 17, 2007); *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F.Supp. 1095, 1097 (D.N.H. 1987). Nor can the Subgrant Agreement be read as an express or implicit license permitting National Able to use its name and marks only in collaboration with Operation ABLE. *Cf. Jaycees*, 639 F.2d at 139 n. 7 (finding arrangement to be a license agreement); *Kappa Sigma*, 654 F.Supp. at 1100 (same). To the contrary, the only restrictions regarding the use of marks that can be found in the Subgrant Agreement are those imposed by National Able on Operation ABLE.

Accordingly, the defendant has shown that the plaintiff acquiesced in its use of the mark 1) in connection with operating its JRT program and 2) in administering the SCSEP program under the Subgrant Agreement.

#### iii. Limitation

National Able's acquiescence defense falters with respect to its use of the marks in connection with providing direct services under the SCSEP program. The Court concludes that such use exceeds the scope of Operation ABLE's consent.

Prior to the time that plaintiff initiated this lawsuit, National Able did not provide direct services to participants under the SCSEP program in Massachusetts but, rather, provided those services through the Subgrant Agreement with plaintiff. By expanding into a new market (i.e., offering direct services under the SCSEP program), National Able "redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks." *See Profitness*, 314 F.3d at 70 (explaining the doctrine of "progressive encroachment").

■ Although National Able has apparently provided direct services to the same SCSEP participants under its JRT program, there is no evidence that that program is in direct competition with Operation ABLE. More importantly, there is no evidence that the defendant's use of the marks in connection with the JRT program ever caused confusion. *See id.* at 69 (noting that likelihood of confusion is a "critical circumstance" bearing on the scope of plaintiff's consent). Thus, the fact that plaintiff acquiesced in that use does not preclude it from challenging the defendant's expansion into an area that "more squarely compete[s]" with its services. *See id.* at 70.

That National Able has exceeded the scope of plaintiff's acquiescence is best demonstrated by evidence of confusion. *See id.* at 68 ("Although a plaintiff cannot simply sleep on his rights, he has no obligation to sue until the likelihood of confusion looms large . . . ." (citation and internal quotation marks omitted)). As the defendant itself argues, there is no evidence of confusion between the two entities during the five years they operated under the Subgrant Agreement or during the past year in which National Able has rented office space from Operation ABLE. Since the defendant notified participants that it will begin servicing them directly, however, plaintiff reports 25 instances of actual confusion. That the likelihood of confusion appears to have substantially increased after the defendant began servicing participants directly under the SCSEP program is persuasive evidence that such use exceeded the scope of Operation ABLE's acquiescence. *See id.* at 69.

In sum, it is apparent that as long as competition between National Able and Operation ABLE was minimal, the likelihood of confusion remained low and Operation ABLE was amenable to the defendant's use of the disputed marks. National Able's expansion into areas that more directly overlap with the plaintiff's services has, however, created confusion and plaintiff is not precluded from asserting its rights now notwithstanding its prior acquiescence to some uses of the marks. Accordingly, this Court concludes that the defenses of acquiescence or laches do not foreclose a challenge to defendant's *expanded* use of the marks.

### c. Likelihood of Confusion

■ Likelihood of confusion is assessed considering the so-called *Pignons* factors: 1) similarity of the marks, 2) similarity of the services, 3) relationship between the parties' channels of trade, 4) relationship between the parties' advertising, 5) classes of prospective purchasers, 6) evidence of actual confusion, 7) defendant's intent in adopting its mark, and 8) strength of plaintiff's mark. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981).

### i. Similarity of the Marks

■ Similarity of marks can be based on sound, appearance and meaning and "is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." *Volks-*

*wagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 817 (1st Cir.1987). Plaintiff asserts that the marks Operation ABLE and ABLE are confusingly similar to National Able Network and Able because both organizations use the word "able" in a way that is identical in sound and meaning. Although they use different logos, the word "able" looks the same when used in text.

Defendant counters that Operation ABLE and National Able Network are significantly dissimilar. With respect to the mark ABLE alone, it suggests that the meaning of the word "able" differs because plaintiff uses that word as an acronym for "Ability Based on Long Experience" while defendant uses it to suggest skill sets. The defendant also asserts that the plaintiff has essentially admitted the marks dissimilarity by agreeing in the Subgrant Agreement to include both marks in the same materials. Finally, it asserts that any similarity has been diluted by the deliberate use of the marks to distinguish (rather than confuse) the organizations.

With respect to the mark ABLE in isolation there is little doubt that its use by both organizations is confusingly similar. Although the defendant points out that plaintiff's use of ABLE has a staccato appearance, it is pronounced like the two syllable word "able." Furthermore, although the plaintiff sometimes uses the mark as an acronym, both organizations use the mark to suggest ability.

With respect to Operation ABLE and National Able Network, the similarities are less striking. On the one hand, as the defendant notes, plaintiff's mark consists of two words and six syllables while its own mark consists of three words and seven syllables. Placement of the word "able" also varies in each mark. *Cf. Calamari Fisheries, Inc. v. The Village Catch,* 698 F.Supp. 994, 1009 (D.Mass.1988) (noting that "The Village Catch" and "The Daily Catch" both "begin with the word 'The,' end with the word 'Catch,' ... contain a two-syllable modifying term in the middle" and "have the same sound and cadence"). On the other hand, the use of words other than "able" within each mark is mostly descriptive, and thus does little to distinguish the entities. Viewed in their entirety, those marks display moderate similarity.

### ii. Similarity of Services, Channels of Trade, Advertising and Prospective Customers

The defendant concedes that the parties offer similar services, operate in the same channels of trade, utilize similar advertizing and service the same customers. It notes, however, that the "customers" that both parties services are virtually unlimited because less than one percent of eligible individuals receive SCSEP funds. Consequently, there is arguably no "competition" between the parties for participants. Nevertheless, these factors weigh in favor of finding a likelihood of confusion.

### iii. Actual Confusion

Although plaintiff "need not show actual confusion to prevail on its claim for service mark infringement," such evidence is "highly persuasive." *Calamari Fisheries,* 698 F.Supp. at 1011. Here, plaintiff asserts that since National Able terminated the Subgrant Agreement and informed participants of the change in their services there have been 25 instances of actual confusion. Defendant responds that plaintiff's evidence of actual confusion is unavailing because it consists of hearsay and vague assertions that "participants have reported being confused," or "I believe that participants ... were confused." The defendant has also submitted an affidavit from one of its own employees that she is unaware of any confusion over the disputed marks.

Although plaintiff's evidence is less persuasive than it would have been had it included affidavits from the actual participants or employees who found the letter confusing, it is nevertheless entitled to some weight and favors a finding of likelihood of confusion.

### iv. Defendant's Intent

■ Although plaintiff asserts that the defendant's conduct is "suspect," it is apparent that the defendant adopted the name National Able Network to avoid confusion and distinguish itself from the plaintiff rather than to engender confusion and trade on plaintiff's goodwill. Although this factor weighs in the defendant's favor, "a finding of good faith is no answer if likelihood of confusion is otherwise established." *Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 11 (1st Cir. 1996) (citation omitted).

### v. Strength of Plaintiff's Marks

■ The strength of a mark is determined by

> evidence of the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark.

*Star Fin.*, 89 F.3d at 11 (citation omitted). Its placement on the spectrum of distinctiveness is also relevant to the inquiry. *See Boston Duck Tours*, 531 F.3d at 16–17.

Plaintiff maintains that it has used the marks Operation ABLE and ABLE continuously for more than 25 years. Moreover, it promotes both marks on its website and has been recognized by those marks in the media. The defendant responds that the strength of the marks, if any, lies in the word Operation because ABLE is an acronym and merely descriptive.

This Court concludes that the mark Operation ABLE is strong. The mark ABLE in isolation, although used less frequently, has been used by the plaintiff to identify its organization for many years and is at least moderately strong. If any part of plaintiff's mark is descriptive or generic it is the term Operation and not ABLE. Accordingly, the strength of the marks weighs in plaintiff's favor.

### vi. Summary of Likelihood of Confusion

■ In sum, of the eight factors identified in *Pignons*, only one weighs in the defendant's favor. Each of the remaining seven supports to one degree or another a finding of likelihood of confusion. Thus, defendant's use of the marks Able and National Able Network create a likelihood of confusion with plaintiff's marks ABLE and Operation ABLE and plaintiff has shown a likelihood of success on the merits.[4]

### 2. Irreparable Harm

■ Plaintiff asserts that this Court must find irreparable harm if it finds a substantial likelihood of success on the merits. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir.1992) ("[I]rreparable harm flows from an unlawful trademark infringement as a matter of law."). The defendant responds that the Supreme Court's recent holding in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), calls into question the propriety of presuming irreparable harm. The holding of that case, however, was confined to permanent injunctions issued under the Patent Act, and the First Circuit has made no indication that the presumption is no long-

---

4. The Court also concludes that the disclaimer proposed by the defendant is not likely to cure such confusion. Notably, the letter sent to participants that first created confusion distinguished the two organizations but apparently to no avail.

er applicable to preliminary injunctions in trademark cases. Accordingly, plaintiff is entitled to a presumption of irreparable harm. Moreover, as explained more fully with respect to defendant's acquiescence and laches arguments, that presumption is not rebutted by the plaintiff's delay in filing suit.

### 3. Balance of the Hardships

If an injunction were to enter the defendant would have to establish a new brand and abandon the name and marks (including registered marks) it has been using for five years at considerable expense. Absent an injunction, however, consumer confusion will likely erode the goodwill that plaintiff has developed over a period of 25 years. This Court therefore concludes that the balance of hardships favors the plaintiff.

### 4. Public Interest

The risk of consumer confusion ordinarily favors entering an injunction when trademarks are found confusingly similar. Defendant, however, advances a novel argument that the public interest would not be served by an injunction in this case because the "consumers" that Operation ABLE and National Able serve are so numerous that there is no real competition. In fact, there are more people in need of services than both organizations can serve. The defendant argues that an injunction would prevent it from operating in Massachusetts under its trade names and thereby deprive valuable services of those in need.

An injunction, however, would not preclude National Able from operating in Massachusetts but rather only preclude it from using marks confusingly similar to those used by Operation ABLE. Accordingly, the interest in avoiding confusion among participants, potential donors and the public favors an injunction notwithstanding the lack of competition for participants.

### ORDER

In accordance with the foregoing, plaintiff's motion for preliminary injunction (Docket No. 3) is **ALLOWED**, in part, and **DENIED**, in part, as specifically set forth in the accompanying injunction.

**So ordered.**