TRIMARK USA, INC., Plaintiff,

v.

PERFORMANCE FOOD GROUP COMPANY, LLC, et al., Defendants.

Civil Action No. 09–11222–JGD.

United States District Court, D. Massachusetts.

Oct. 21, 2009.

Barbara S. Cohen, Winograd, Shine & Zacks, P.C., Providence, RI, Joseph L. Fogel, Hillary P. Krantz, David L. Ter Molen, Eugene F. Zelek, Jr., Freeborn & Peters LLP, Chicago, IL, for Plaintiff.

Stephen P. Demm, Hunton & Williams LLP, Richmond, VA, Diane M. Saunders, Jeffrey Scott Siegel, Morgan, Brown & Joy, LLP, Boston, MA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

This matter is presently before the court on the "Plaintiff TriMark USA Inc.'s Motion for Injunctive Relief" (Docket No. 13). After consideration of the written submissions and argument of counsel, the motion is ALLOWED. The Defendants, Performance Food Group Company and Springfield Foodservice (collectively, "Performance"), are hereby enjoined from using the three-arc logo in connection with the advertising, offering for sale, or sale of their products and services until further order of the court. A hearing is scheduled for Monday, October 26, 2009 at 12:00 P.M. to address the language of the injunction, the amount of security, if any, which should be ordered pursuant to Fed.R.Civ.P. 65(c), and the scheduling of this case for a prompt trial.

## II. OVERVIEW[1]

TriMark is a foodservice supply and equipment distributor headquartered in South Attleboro, Massachusetts. (Hyman Decl. ¶ 1). Its sales in 2008 were $595 million, which made it the second largest non-food foodservice distributor in the United States. (Hyman Supp. Decl. ¶ 2). TriMark is the owner of a federally registered and incontestable design mark that has been part of its corporate branding

---

**1.** The facts in this decision are derived from: (1) Attachments to the Plaintiff's Memorandum in Support of Its Motion for Preliminary Injunction ("Pl.'s Mem.") (Docket No. 14), including the Declaration of Jerald Hyman ("Hyman Decl.") attached as Exhibit A, and the Declaration of Hillary P. Krantz ("Krantz Decl.") attached as Exhibit B; (2) Attachments to Performance's Opposition to TriMark's Motion for Preliminary Injunction ("Defs.' Opp.") (Docket No. 18), including the Declaration of Fred A. Sanelli ("Sanelli Decl.") attached as Exhibit A, and the Declaration of Stephen P. Demm ("Demm Decl.") attached as Exhibit B; (3) Attachments to the Revised Plaintiff's Reply Memorandum In Support of Motion for Preliminary Injunction ("Pl.'s Reply Mem.") (Docket No. 23), including the Supplemental Declaration of Jerald Hyman ("Hyman Supp. Decl.") attached as Exhibit A, and the Supplemental Declaration of Hillary P. Krantz ("Krantz Supp. Decl.") attached as Exhibit B; (4) Performance's Sur–Reply In Opposition to TriMark's Motion for Preliminary Injunction ("Defs.' Sur–Reply") (Docket No. 24); and (5) the Supplemental Declaration of Stephan P. Demm ("Demm. Supp. Decl.") (Docket No. 25).

identity since 2001 (the "TriMark Logo").[2] (*See* Hyman Decl. ¶ 18; Krantz Decl. Ex. 1). TriMark uses the TriMark Logo to identify, advertise and promote its foodservice distribution business, and to integrate businesses it has acquired as part of its expansion in the marketplace. (Hyman Decl. ¶¶ 18, 22–23). The TriMark Logo consists of three concentric, curved arcs that increase in size from left to right in a shade of red, among other colors. (*Id.* at ¶ 19). In addition, TriMark has also continuously used the "negative image" of the TriMark Logo. (*Id.* at ¶ 21).

Performance provides food and beverage products to the foodservice industry, primarily through its broadline distributors.[3] (Sanelli Decl. ¶ 3). It has $10 billion in annual revenues, and is the third largest business of its kind in the United States. (*Id.* at ¶ 6). In addition to its sale of food and beverage products, approximately 4% of its sales are of non-food and beverage foodservice products of the type that compete directly with TriMark. (*See id.* at ¶ 10). Assuming $400 million worth of non-food product sales, this would make Performance the fourth largest non-foodservice distributor in the United States, in comparison to TriMark, which is the second largest. (Hyman Supp. Decl. ¶ 2).

Until June 2009, Performance and its local operating companies were known as "Performance Food Group" or "PFG." (Sanelli Decl. ¶¶ 7, 11). It used a design mark (the "PFG Logo"), which was a stylized representation of four feathers in some shade of red. (*Id.* at ¶ 8). In June 2009, Performance announced "a new look and our new name . . ." for its broadline distribution companies. (Hyman Supp. Decl. Ex. 7). Performance Food Group was changed to "Performance Foodservice." (Sanelli Decl. ¶ 11). This change, as reported in an industry publication, was done "[i]n an attempt to reflect and identify with its focus in service-related products." (Krantz Decl. Ex. 3).[4] In addition, Performance changed its logo to three concentric, curved arcs that increase in size from left to right (the "Performance Logo"), a logo which TriMark contends is confusingly similar to the TriMark Logo. (Hyman Decl. ¶ 27). Performance describes this mark as a "stylized P." (Sanelli Decl. ¶ 12). On June 15, 2009, Performance filed an intent-to-use application with the USPTO to register its new design mark alone, as well as with the words "Performance Foodservice" and "Performance Foodservice Have a Taste." (Krantz Decl. ¶¶ 6–7, Exs. 4–5). In these registrations, Performance describes its business as "wholesale distributorships featuring food and beverage products and other food service industry supplies," and the mark is described as "left facing curved lines." (*Id.* at Exs. 4–5). In addition, Performance filed a registration claiming the color red as a feature of the mark. (*Id.* at Ex. 5). The PTO Examining Attorney found no conflicting marks to bar registration, and

---

2. The TriMark Logo is registered in the United States Patent and Trademark Office ("PTO") as Registration No. 2,759,484, which issued on September 2, 2003. (Krantz Decl. Ex. 1). It became incontestable in 2009.

3. "Broadline" refers to the Performance companies that distribute a broad range of foods and beverages. Performance also owns companies which specialize in specific types of foods or which service specific customers. (*See* Sanelli Decl. ¶ 3).

4. Performance contends that the change to "foodservice" "would emphasize Performance's role as a food distributor, as opposed to a food buying group. Food buying groups, which operate in a different channel of the foodservice industry than Performance, often include the word GROUP in their name." (Sanelli Decl. ¶ 11).

the applications are scheduled to be published for opposition. (Demm. Supp. Decl. ¶ 4). TriMark intends to oppose these registrations.

TriMark sent Performance a cease and desist letter on July 1, 2009, one day after learning of the new Logo. (Krantz Decl. Ex. 6). Performance denied any liability by letter dated July 8, 2009. (*Id.* at Ex. 7). TriMark commenced this action on July 17, 2009. The parties engaged in some settlement discussions, during which time Performance voluntarily agreed to delay the roll-out of its new design. Those discussions were unsuccessful. A hearing on TriMark's motion for a preliminary injunction was held on October 15, 2009 (after having been continued at the request of the parties). At that time, Performance informed the court that the roll-out of the new name and Logo had begun. This has included use of the new mark on multiple websites, trucks, business cards, business forms, letterhead, hats and shirts, among other things. (*See* Sanelli Decl. ¶ 19).

Additional facts will be provided below where appropriate.

## III. *ANALYSIS*

### A. *Standard of Review—Preliminary Injunction*

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir.2004) (quotations and citations omitted). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Id.* (quotations, citations and punctuation omitted). " 'The status quo to be preserved is not the situation of contested rights.... In a trademark case, it is the situation prior to the time the junior user

began use of its contested mark: the last peaceable, non-contested status.'" *Id.* (quoting 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed.2003) (punctuation omitted)).

"In considering a motion for a preliminary injunction, a district court must consider: '(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Gonzalez–Droz v. Gonzalez–Colon,* 573 F.3d 75, 79 (1st Cir.2009) (quoting *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 11 (1st Cir.2008) (additional quotation marks and citations omitted)). The burden is on the moving party to establish that consideration of these factors supports the issuance of a preliminary injunction. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir.2004); *Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc.,* 473 F.Supp.2d 168, 171 (D.Mass.2007). As detailed below, applying these principles to the instant case compels the conclusion that a preliminary injunction should be issued.

### B. *Likelihood of Success on the Merits*

In the instant case, the parties seriously dispute TriMark's likelihood of succeeding on the merits of its claim. This court finds, however, that TriMark has met its burden of proving that it is likely to prevail at trial.

### *Standard of Review*

"Likelihood of success is the main bearing wall of the [preliminary injunction] four-factor framework." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d

12, 16 (1st Cir.1996). "The importance of that inquiry is magnified in trademark cases because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir.2006). "To succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." *Boston Duck Tours*, 531 F.3d at 12. It is undisputed in the instant case that TriMark's mark is entitled to protection. Accordingly, the dispute focuses on whether TriMark will be able to establish "likely confusion" between the marks.

■ This court finds that to establish "likely confusion" TriMark must establish "more than a theoretical possibility of confusion." *Id.* (quotation and citation omitted). Rather, "the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Id.* (quoting *Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir.1996)). Performance argues that the standard to be applied by this court is even higher. Relying on *Church of the Larger Fellowship Unitarian Universalist v. Conservation Law Found. of New England, Inc.*, 221 U.S.P.Q. 869 (D.Mass.1983), Performance argues that TriMark must establish that a "substantial" likelihood of confusion exists. This court does not agree. It is true that in *Church of the Larger Fellowship*, the District Judge held that the Court of Appeals, in *Pignons S.A. de Mecanique de Precision v. Polaroid, Corp.*, 657 F.2d 482, 487 (1st Cir.1981), "has stated that a substantial likelihood of confusion must exist."

*Church of the Larger Fellowship*, 221 U.S.P.Q. at 871. However, in *Pignons*, the First Circuit only referred to "substantial evidence" in connection with the standard for establishing a genuine issue in dispute for purposes of summary judgment. *Pignons*, 657 F.2d at 486 (a "factual dispute is material if it affects the outcome of the litigation, and genuine if manifested by substantial evidence going beyond the allegations of the complaint" (quotations omitted)). Nowhere did it hold that a party most prove a "substantial likelihood of confusion." *See id.* at 487 ("In assessing likelihood of confusion, courts have commonly looked to the following factors...."). Similarly, recent First Circuit cases make no mention of the need to establish a "substantial" likelihood of confusion. *See, e.g., Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 72 (1st Cir.2008) ("A trademark holder must show a *likelihood* of confusion; it need not show actual confusion, but actual confusion will strengthen the holder's infringement claim") (emphasis in original)). *Accord Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 60–61 (1st Cir.2008). Therefore, this court rejects Performance's argument that TriMark must establish a "substantial" likelihood of confusion to prevail.

### *Relevant Factors*

Courts have applied a "non-exclusive list of factors against which a finding of a likelihood of confusion is assessed," including the following:

(1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark;

and (8) the strength of the plaintiff's mark. *Visible Systems Corp.,* 551 F.3d at 73 (citation omitted). Each of these factors will be discussed below.

### Similarity of the Marks

 The parties agree on the appropriate standard to be applied in assessing the similarity of the marks. Thus, "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons,* 657 F.2d at 487 (quotation and citation omitted). *See also Aura Commc'ns, Inc. v. Aura Networks, Inc.,* 148 F.Supp.2d 91, 94 (D.Mass.2001) ("Conflicting marks are to be compared by analyzing them as a whole rather than comparing them by their component parts."). The parties disagree, however, as to what the court should consider to be the "whole" of the mark. Performance contends that the designs of both companies' logos are never used without a company name, while TriMark contends that in a number of circumstances it uses the design without the name. The record before this court supports TriMark's contention.

TriMark has submitted evidence that one of its most popular products is glassware, and that since 2000 it has molded the TriMark Logo into its most popular glassware products. (Hyman Supp. Decl. ¶ 7, Ex. 4). TriMark has invested approximately $250,000 in the glass mold, which includes the TriMark Logo without the TriMark name in every piece of marked glassware. (*Id.*). In addition, TriMark has submitted evidence that the TriMark Logo, without the name, is incorporated into certain product labels, such as the UniPower Pine Disinfectant product, which contains the Logo in the cape of a super-hero type figure. (*Id.* at ¶ 7, Ex. 5). Finally, TriMark has submitted a number of examples where the Logo, without the name, is repeated on a product which also contains the Logo and name. For example, TriMark's stationery contains the Logo and name in the upper left hand corner, and then the Logo alone is used as a large watermark on the page. The repeated use of the Logo without the name as a background pattern is found on TriMark's business cards, folders, brochures and the like. (*See, e.g., id.* at ¶ 8, Ex. 6). TriMark also repeats its Logo without its name on the bottom corners of pages of catalogues, where its name and Logo appear on the top of the page. (Hyman Supp. Decl. Ex. 1). Thus, it is clear that TriMark intended the consumer to recognize the Logo standing on its own.

Similarly, Performance uses its design separately from its name as a background pattern on its stationery. (*Id.* at ¶ 8, Ex. 7). Furthermore, as noted above, Performance has filed a trademark application for the design standing alone. (Krantz Decl. ¶¶ 6–7, Exs. 4–5). Thus, the record establishes that both TriMark and Performance use the mark alone, and as part of their branding efforts.

Performance does not seriously challenge the conclusion that the marks, standing alone, are very similar. Both consist of three concentric, curved arcs that increase in size from left to right in a shade of red, among other colors. The Performance Logo is virtually identical to the negative image of the TriMark Logo used as a watermark and other background markings on TriMark's printed materials. The only difference is that the arcs are angled slightly differently. Thus, to the extent that the design is considered the "whole" of the mark, there is little question that they are substantially similar.

That, however, does not end the inquiry. Performance has represented that it would be willing to forego the use of the design

alone, at least on a temporary basis. Thus, the question squarely presented is whether the use of the design next to the word TriMark or Performance renders them sufficiently dissimilar to avoid confusion. "It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983). This is not such a case.

As an initial matter, Performance argues that the parties' company names dominate as they are larger and more centrally located. (Defs.' Opp. at 10–11). This court does not agree. The design is virtually the same size and prominence as the company names. Moreover, given the repeated use of the marks alone by both TriMark and Performance as watermarks on stationery, for example, the designs are clearly an important part of the parties' branding efforts, and are not overshadowed or made less relevant by the inclusion of the name. *See and compare Aura*, 148 F.Supp.2d at 94 (the right-leaning arch of the dominant word was the most predominant and eye-catching feature, thereby making the addition of other words as distinguishing factors irrelevant). *See also Sunquest Info. Sys., Inc. v. Park City Solutions, Inc.*, 130 F.Supp.2d 680, 692–693 (W.D.Pa.2000) (in determining the overall weight of the two marks, weight is given to the dominant features; the court found that where two of three dominant features are identical, placing the defendant's name next to the logo neither alters the overall impression created by the logo nor lessens the likelihood that consumers will confuse the logo with plaintiff's logo).

In addition, given the realities of the marketplace, the fact that the companies both use their names does not lead to the conclusion that they are distinct entities. "Courts consider the totality of circumstances surrounding the use of the marks: 'Similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the 'circumstances surrounding the purchase of the goods' or services.' " *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F.Supp. 456, 477 (D.Mass.1997) (quoting *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1009 (D.Mass.1988)). In the instant case, the design is the most significant common element of both TriMark's and Performance's composite marks because it is the unifying logo for all local operating companies. (*See* Hyman Decl. ¶¶ 23–25).

TriMark uses its design to the left of the word TriMark, under which is often found the name of TriMark's various local operating companies. (*See* Pl.'s Reply Mem. at Ex. C). TriMark has expanded in the marketplace by acquiring different companies, and it uses their names under the name TriMark. Once a company is acquired, TriMark undertakes extensive rebranding, featuring the TriMark Logo prominently on all of that company's marketing materials, stationery, business cards, and the mechanisms used for transporting its products, such as packing boxes and trucks. (Hyman Decl. ¶ 23). The Logo continues to serve as the unifying corporate mark for TriMark and its various acquired entities. Similarly, Performance uses its design to the left of the word Performance, under which it plans to use the word Foodservice followed by the name of its local operating companies. (Krantz Supp. Decl. ¶ 6). Performance too has expanded in the marketplace by acquiring different companies, and it continues to use the names of those companies along with the name Performance. (*Id.*). Performance's Logo also serves as the unifying corporate mark for Performance and

all of its acquired companies. Each of the parties apparently has "recognize[d] that placing all of its companies under a common image is more important than placing them under a common name." *Sunquest*, 130 F.Supp.2d at 694. Thus, as TriMark argues, "[g]iven the nature of the marketplace, the use of the [Performance] Mark by PFG and its various operating companies suggests that PFG has a relationship with TriMark, that TriMark has acquired PFG, or that PFG has acquired TriMark (a reasonable assumption, particularly if one believes PFG's contentions about the relative size of the parties)." (Pl.'s Reply Mem. at 4–5). Instead of serving to distinguish the companies, the use of the corporate names adds to the confusion.[5]

The cases cited by Performance do not compel a different result. In all of the cases there were additional significant facts that decreased the likelihood of confusion. *See, e.g., Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir.1993) (LEAF EATER for leaf shredders not confusingly similar to WEED EATER, which was used in conjunction with FLOWTRON or VORNADO, where goods differed in terms of their functional purpose and co-existed in the same market for a number of years with weak finding of actual confusion); *Pignons*, 657 F.2d at 487–488, 490–491 (ALPHA for cameras not confusingly similar to ALPA for cameras where ALPHA appeared near POLAROID, types of cameras differed, packaging differed significantly, marketing channels

differed, and products co-existed in the same market for a number of years with a weak showing of actual confusion); *Infinity Broad. Corp. v. Greater Boston Radio*, 32 U.S.P.Q.2d 1925, 1933 (D. Mass 1994) (WBCS for radio station not confusingly similar to WBCN for radio station where WBCS presented in conjunction with "Country 96.9" and "We're Boston's Country Radio," where two stations were very different in terms of image, format, music type, and target audiences); *NEC Elecs., Inc. v. N.E. Circuit Sales, Inc.*, 722 F.Supp. 861, 864–865 (D.Mass.1989) (NECS for computer chip brokerage services not confusingly similar to NEC for sale of computer chips where NECS usually appeared near New England Circuit Sales, the nature of the products differed, types of customers differed, the nature of companies' self-promotion differed, and there was no evidence of actual confusion after marks had co-existed in same marketplace for almost five years); *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F.Supp. 120 (D.Mass.1996) ("We Make Life Simple" for supermarkets not confusingly similar to "It's That Simple" for supermarkets where "We Make Life Simple" appeared near BIG Y and "It's That Simple" usually appeared near STOP & SHOP; plaintiff's mark was not a strong mark because it was not a federally registered trademark, it had not acquired a secondary meaning, and it had been in existence for only one week when defendant introduced its mark). In addition, all

---

5. This court also finds that since a customer can view the word "Performance" as a corporate goal, rather than a corporate name, the fact that the virtually identical mark is followed by the word Performance does not necessarily give notice to the customer that it is not dealing with TriMark. *See Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 935 (S.D.Ohio 1999) (Abercrombie's use of the word "performance" among other words on labels, advertis-

ing and promotional materials, is too descriptive to qualify for trade dress protection.). In so finding, this court does recognize that the PTO has registered and approved several of Performance's marks, without ruling Performance descriptive. Nevertheless, this does not negate the fact that an unknowing customer would not immediately be put on notice that "Performance" refers to a separate company from TriMark.

of Performance's cases involved similar or identical *words* appearing near dissimilar *words*, as opposed to similar *designs* appearing near dissimilar *words*. In the instant case, in contrast, there are directly competing products in the same markets with virtually identical logos. The distinguishing facts in the cases relied on by Performance do not exist here.

Since both TriMark and Performance have grown by taking over other companies, use the other companies' names along with their own, and use the (virtually identical) design as the unifying branding mark, this court finds that the addition of their corporate names would not prevent likely confusion. "[A] junior user cannot justify its confusing use of another's mark simply by tacking on its own house mark or trade name. Such a usage may merely suggest to consumers that plaintiff has licensed defendant or that the parties are affiliated in some other way." *McCarthy on Trademarks and Unfair Competition,* § 23:43 (4th Ed.2008). *See also Aura,* 148 F.Supp.2d at 94 (two marks "unquestionably similar" despite attempt to distinguish mark based on addition of word "NET-WORKS" to the design); *Trak, Inc. v. Benner Ski KG,* 475 F.Supp. 1076, 1082 (D.Mass.1979) (junior user's addition of its corporate name to the word "fishstep" did not preclude confusion with Trak's "fishscale" mark: "the presence of 'Benner' on the ski might suggest to the consumer that Benner somehow is licensed to do business by Trak"). As TriMark convincingly argues, "a TriMark customer who generally recalls the TriMark Logo might easily come across a PFG sales representative and, upon seeing the [Performance] Mark on a business card or product, believe it is the TriMark Logo and that the parties are affiliated with each other. After all, with an infinite number of designs to choose from, why would competitors both have logos consisting of three, red concentric

lines curving in the same direction that are situated to the left of the name of the operating company?" (Pl.'s Reply Mem. at 6–7).

█ Finally, Performance argues that the court should consider the fact that the PTO examining attorney approved publication of the Performance marks for opposition as evidence that they are not substantially similar to TriMark's. (*See* Demm Supp. Decl. ¶ 4, Ex. B). This argument is not persuasive. It is undisputed that publication of a mark is not equivalent to its allowance or registration. Rather, the PTO will issue a Certificate of Registration only if "all oppositions filed" after publication are dismissed. 37 C.F.R. § 2.81. Here, TriMark intends to file oppositions which, obviously, have not yet been considered. Even more importantly, however, here "[t]he record contains no information about the basis for the publication decision or about what information was before the examining attorney at that time" and there is no evidence that the PTO actually compared the logos "much less that it found the marks not to be confusingly similar." *Kos Pharm., Inc.,* 369 F.3d at 714–15. Under such circumstances, the fact that the PTO approved publication of the mark for opposition is entitled to "no weight." *Id.* (quotation and citation omitted). "Indeed, even where the record shows that an examining attorney has explicitly considered a prior mark, we have held that an 'initial PTO determination ... may be considered [but] need not be given weight when the PTO attorney did not review all the evidence available to the District Court.'" *Id.* at 715 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 221 (3d Cir. 2000)).

In sum, this court finds that the marks are substantially similar, weighing in favor of a finding of likely confusion.

### Similarity of the Goods

■ The next factor to be considered, the similarity of the goods, also leans in favor of finding a likelihood of confusion. TriMark has submitted substantial evidence that it competes directly with Performance in the foodservice supply industry and that both companies sell similar goods. Thus, they both "regularly compete for sales of foodservice supplies, disposables (*e.g.,* trash can liners, napkins, to-go containers, gloves, paper towels and plastic film), counter and light equipment, glassware, tableware and smallwares (*e.g.,* pots, pans and kitchen utensils) to independent and chain restaurants, hotels, country clubs, healthcare facilities and numerous other businesses." (Hyman Decl. ¶ 4). A review of their catalogues establishes that they not only sell the same types of items, but also, in certain circumstances, sell identical products. (*See* Hyman Supp. Decl. ¶ 4, Exs. 1 & 2). In addition, Performance and TriMark recently competed in the same bidding process to supply foodservice products for a national chain restaurant customer. (Hyman Decl. ¶¶ 16–17). Finally, as noted above, in its trademark registration applications Performance described its business as distributing "food and beverage products and other food service industry supplies." (Krantz Decl. Exs. 4–5).

Performance denies that it is a direct competitor of TriMark since its primary competitors are other national broadline food and beverage distributors. (Sanelli Decl. ¶¶ 9–10). Ninety-six percent of its business is food products. (*Id.* at ¶ 10). However, while only 4% of its business may consist of foodservice supplies, that is a significant amount of business that competes directly with TriMark. For example, Performance was reported to have non-food sales of more than $210 million in 2004, representing an 11% increase in such sales over the prior year. (Hyman Decl. ¶ 15, Ex. 6). In the instant case, Performance has indicated that 4% of its $10 billion annual sales were for non-food items—*i.e.,* $400 million—which is roughly two-thirds of TriMark's total sales in 2008. (Hyman Supp. Decl. ¶ 2). This is a significant amount of overlapping goods.

Performance further contends that just because both it and TriMark sell to the foodservice industry, this does not mean that the actual goods sold are the same. Performance cites to *N. Trust Corp. v. N. Bank & Trust Co.,* 22 U.S.P.Q.2d 1391 (D.Mass.1991), in which the court found that the defendant's Northern Bank & Trust mark was not confusingly similar to the plaintiff's Northern Trust and Northern marks, even though both the plaintiff and defendant offered banking services, and even a few overlapping banking services. The court "conclude[d] that plaintiff's services are more sophisticated than defendant's, and therefore are substantively distinguishable." *Id.* at 1392. However, the fact that these two banks offered distinguishable types of services within the same industry does not support Performance's contentions here since, as previously evidenced, Performance and TriMark sell not only the same types of items, but also, at times, identical products. (Hyman Supp. Decl. ¶ 4, Exs. 1 & 2).

Finally, Performance refers to a 2006 lawsuit TriMark filed against it in Springfield Superior Court in connection with an employee who left TriMark to work for PFG. There the court denied a preliminary injunction, finding that the two companies were not direct competitors. However, as part of that lawsuit, Performance filed an affidavit stating that, in light of the employee's non-compete agreement with TriMark, the employee was to have "no direct or indirect responsibilities with regard to sales of any equipment or non-food sup-

plies to restaurants, hotels or foodservice facilities located within an area of [100] miles from TriMark's office in South Attleboro, Massachusetts, or in any county of any state where you conducted business on behalf of TriMark." (Hyman Supp. Decl. Ex. 8 at ¶ 16). In fact, the employee was to have no responsibility for any sales of non-food supplies so as to avoid running afoul of his non-competition agreement. (*Id.* at ¶¶ 18–22). If anything, the prior lawsuit shows that TriMark and Performance are direct competitors in certain aspects of Performance's business. The similarity of the products sold by TriMark and Performance favors a finding of likelihood of confusion.

### Relationship Between Channels of Trade, Advertising and Prospective Purchasers

The trade channels, advertising channels, and prospective purchasers are interrelated factors that are generally considered together. *See Astra,* 718 F.2d at 1206. Both TriMark and Performance sell their products and services through local operating companies under various trade names. As detailed above, they both use their Logo to present a unified image in the national marketplace, and Performance intends to continue to do so with its new design mark. (Hyman Decl. ¶ 6; Krantz Supp. Decl. ¶ 6).

TriMark has submitted substantial evidence to establish that both companies advertise and market their goods in the same manner. (*See* Hyman Decl. at ¶ 6). As examples, TriMark has proved that both companies advertise their services via their websites and catalogs, attend many of the same trade shows, exhibit their products and services at common trade shows, are members of many of the same trade organizations, are frequently featured in the same trade publications, and conduct in-person sales efforts with many

of the same sales customers. (*Id.* at ¶¶ 9–13). Performance does not dispute these contentions.

TriMark further has established that it competes for business from the same customers and potential customers as Performance, namely independent and chain restaurants, hotels, country clubs, healthcare facilities and numerous other businesses. (Hyman Decl. ¶¶ 4, 6). As previously noted, TriMark cites to an example in which both TriMark and PFG supplied certain products to the same national chain restaurant customer, and subsequently competed in a competitive bid to supply products to the customer, with the TriMark-related entity eventually prevailing. Performance continues to supply other products to this customer. (*Id.* at ¶¶ 16–17). Finally, to the extent that the marketing and purchasers are not identical, there is "overlap in these categories that could increase the risk of confusion." *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F.Supp. 49, 55–56 (D.Mass.1990).

Since TriMark and Performance sell only to foodservice businesses, Performance argues that foodservice businesses are sophisticated and will not be confused even when purchasing similar products bearing similar marks from competing dealers. Performance relies on *Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.,* 762 F.Supp. 404 (D.Mass.1991), in which the court found the limited number of wholesale frozen seafood customers were sophisticated customers, and not likely to be confused "by the parties' advertising and distribution of their respective products and services." *Id.* at 413. Contrary to Performance's contention, however, *Bayshore* does not stand for the proposition that all business customers, as opposed to individual consumers, are sophisticated customers as a matter of law. In *Bayshore,* there was a very small cus-

tomer base, and the parties dealt with the buyers personally on a weekly basis. *Id.* In the instant case, TriMark has submitted evidence that approximately 60% of its customers are smaller independent restaurants, where supply products are purchased on a week-to-week basis without any formal contract documents. (Hyman Supp. Decl. at ¶ 9). There is no evidence that these customers have the same level of personal involvement in the purchasing process as those in *Bayshore.* Moreover, according to TriMark, its customers are not large sophisticated corporations with employees assigned to purchasing who keep track of suppliers' names and corporate affiliations. (*See id.*). These customers purchase items from both TriMark and Performance, and are likely to be confused by the nearly identical logos. (*Id.*). The record does not support Performance's contention that the relevant customers are all sophisticated consumers who would not be confused.

Finally, Performance attempts to distinguish itself from TriMark on the basis that TriMark is allegedly "a smaller, more regional company that primarily sells restaurant design services and fixtures." (Sanelli Decl. ¶ 10). This is not supported by the record. Rather, TriMark has facilities throughout the country. (Hyman Supp. Decl. ¶ 10). Moreover, in 2008, restaurant design services comprised only .02% of TriMark's sales. (*Id.*).

In sum, the fact that the parties share channels of trade, advertising channels and prospective purchasers all weigh in favor of a finding of a likelihood of confusion between the marks.

### Evidence of Actual Confusion

■ TriMark has not presented any evidence to establish that the Performance Logo has created any actual confusion among consumers. "Historically," however, courts "have attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time." *Borinquen,* 443 F.3d at 121. *See also N. Light Tech. v. N. Lights Club,* 97 F.Supp.2d 96, 114 (D.Mass.2000) ("In the First Circuit, courts have only attributed significance to a lack of actual confusion in cases in which the relevant products or services coexisted for at least several years.") (collecting cases). Moreover, proof of actual confusion is not essential to a finding of likelihood of confusion. *Borinquen,* 443 F.3d at 120–121, and cases cited. In the instant case, only a few months have passed during which time the Logos have both been used. Moreover, Performance stopped the use of the new Logo for at least some period in the last few months pending settlement discussions. "This period of time is not sufficient to create the presumption that a lack of evidence of actual confusion is significant." *N. Light,* 97 F.Supp.2d at 114. I find this to be an irrelevant consideration in assessing the likelihood that TriMark will prevail on the merits of its claim.

### Defendant's Intent in Adopting its Mark

■ "Whether the defendant acted in bad faith in adopting its mark is another factor to be considered in determining the likelihood of consumer confusion." *Boston Duck Tours,* 531 F.3d at 25–26. TriMark contends that Performance acted recklessly, if not intentionally, in adopting its new Logo. There is no question that at least some persons at Performance were aware of the TriMark Logo. Not only do the companies share many customers and appear at industry events together, but also in connection with at least one customer, TriMark and PFG entered into an agreement whereby TriMark products, packed

in boxes featuring the TriMark Logo, were sent to PFG distribution facilities and delivered by PFG, so as to reduce the number of deliveries to the customer. (Hyman Decl. ¶ 16). TriMark paid PFG with checks, including those bearing the TriMark Logo. (*Id.*). Thus, there is substantial evidence that Performance should have been aware of the TriMark Logo.

In further support of its contention that Performance acted recklessly, TriMark points to the fact that there is no evidence that Performance conducted any type of trademark search prior to changing its Logo. Given Performance's name change and apparent intent to increase its presence in the foodservice supply business, Performance should have taken steps to ensure that it would not be infringing on the rights of other suppliers in the market. *See Rexel, Inc. v. Rexel Int'l Trading Corp.*, 540 F.Supp.2d 1154, 1170 (C.D.Cal. 2008) (finding that this factor weighed in favor of plaintiff trademark owner where, despite knowledge about the plaintiffs, defendant "did not seek the assistance of an outside attorney and/or conduct any additional 'due diligence' to discover the precise nature of Plaintiffs' business"); *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir.1999) ("intentional blindness" of defendant weighs "substantially" in plaintiff's favor on issue of intent).

For its part, Performance contends that those involved in modifying the trademark did not know about TriMark's Logo, or even about TriMark. (*See* Sanelli Decl. at ¶¶ 16–17). It further contends that the Logo evolved out of the prior feather logo, and is supposed to represent a stylized "P." (*Id.* at ¶ 12). Even assuming this to be true, it merely renders the "intent" factor irrelevant in assessing whether confusion is likely. "Although intent to confuse consumers can constitute strong evi-

dence of confusion, the converse is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Rexel*, 540 F.Supp.2d at 1170 (internal punctuation and quotation omitted). Therefore, Performance's (disputed) intent will not be a significant factor in assessing likelihood of confusion.

### *Strength of Plaintiff's Mark*

■ The First Circuit has identified several factors to be considered in determining the strength of the plaintiff's mark, including the "length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's efforts to promote and protect its mark." *Boston Duck Tours*, 531 F.3d at 36 (citing *Borinquen*, 443 F.3d at 121). An analysis of these factors weigh heavily in favor of TriMark.

In terms of length of time, the TriMark Logo has been used in commerce since 2001 and has been a registered trademark since 2003. (Hyman Decl. ¶ 18; Krantz Decl. ¶¶ 3–4 & Exs. 1–2). TriMark has consistently used its Logo as part of its branding campaign, featuring it prominently on advertising and marketing materials, delivery trucks, business cards, packaging materials, promotional materials, and promotional items. (Hyman Decl. ¶¶ 23–24). TriMark contends that its ongoing use of the TriMark Logo for nearly a decade has resulted in TriMark and its products and services becoming widely known and recognized by the TriMark Logo, thereby creating substantial goodwill in the Logo. (*Id.* at ¶ 20). Performance, however, adopted its mark in 2009, and thus has not yet had the opportunity to create substantial recognition or goodwill in its new design.

TriMark is also renowned in the industry as a nationally known foodservice distributor; it ranked second out of 100 "Distribution Giants" in the 2008 and 2009 annual lists published by Foodservice Equipment and Supplies. (*Id.* at ¶ 13). TriMark is a prominent exhibitor at industry trade shows and belongs to key trade organizations. (*Id.* at ¶¶ 11–12). TriMark uses its unifying Logo in connection with its expansion in the marketplace, and "views this unified approach as necessary to compete with larger food-service distributors, such as PFG, which use similar branding strategies and directly compete with TriMark on a national basis." (*Id.* at ¶ 25).

Regarding the potency of its mark in the product field, TriMark's recent trademark search reveals that although there are a number of marks with designs incorporating concentric arcs, none of those designs is used in connection with wholesale foodservice distribution services. (Krantz Decl. ¶ 8). *See Borinquen,* 443 F.3d at 121 (mark determined to be potent where trademarked product name was the only one in the field). Therefore, this factor weighs in TriMark's favor as well.

Finally, as for TriMark's efforts to promote and protect the mark, TriMark cites to the registration of the mark, as well as its effort to make the mark part of its coordinated branding campaign. (Hyman Decl. ¶ 20–25; Krantz Decl. ¶¶ 3–4, Exs. 1–2). Under the Lanham Act, such registration is "prima facie evidence of … the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in this registration[.]" 15 U.S.C. § 1115(a). Therefore, TriMark is presumed to have established its right to exclusive use of the mark. Moreover, there is evidence in the record that TriMark spent in excess of $1 million in 2008 for the purpose of advertis-

ing and promoting the business through the TriMark Logo. (Hyman Decl. ¶ 22). All of these factors weigh in TriMark's favor in establishing likelihood of confusion.

### Summary of Factors

Weighing all of the factors, TriMark has established a strong likelihood that Performance's use of its new Logo will confound "an appreciable number of reasonably prudent purchasers exercising ordinary care." *Boston Duck Tours,* 531 F.3d at 12 (quotation omitted). Since it is undisputed that its Logo merits protection, the other component of TriMark's trademark infringement claim, this court concludes that TriMark has established a likelihood of success on the merits of its claim.

### C. *Potential for Irreparable Harm*

 Where, as here, the plaintiff demonstrates a likelihood of success on the merits of its trademark infringement claim, it is presumed that without injunctive relief it will be irreparably harmed. *See Borinquen,* 443 F.3d at 115 (citing *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 33 (1st Cir.1998), for the proposition that "irreparable harm can be assumed if a trademark holder demonstrates that it is likely to succeed in establishing infringement"). Moreover, "harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable.'" *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989) (citing *Camel Hair & Cashmere Inst. of Am. v. Assoc. Dry Goods Corp.,* 799 F.2d 6, 14–15 (1st Cir.1986)). Therefore, TriMark has satisfied this component of the preliminary injunction analysis.

### D. *Public Interest*

Performance does not dispute that if TriMark establishes a likelihood of success on the merits of its claim, the public interest favors the issuance of an injunction. As the court held in *Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F.Supp.2d 77 (D.Mass.2008):

> In trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions." Plaintiff here has demonstrated a likelihood of consumer confusion, and that showing is enough to place the weight of public interest concerns in favor of granting the injunction.

*Id.* at 88 (internal quotations and citations omitted). The same result should be reached in the instant case.

### E. *Balancing of the Equities*

■ The balance of the harms also compels the conclusion that an injunction should be issued in the instant case. TriMark has invested in its Logo for over 8 years, while Performance is at the beginning of its rebranding campaign. The fact that TriMark will suffer irreparable harm to its goodwill and investment in the Logo has already been established. "Harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms." *Boustany v. Boston Dental Group, Inc.*, 42 F.Supp.2d 100, 111 (D.Mass.1999) (citation and punctuation omitted).

TriMark gave Performance notice of its infringement claim after the very first public announcement of the new mark. To the extent that Performance elected to proceed to roll-out its new Logo, it did so at its own risk. While delaying the roll-out may be problematic, such harm does not appear to this court to be irreparable.[6] *See Trak Inc.*, 475 F.Supp. at 1078 ("a preliminary injunction is in one sense an act of kindness to the defendant" who was just beginning his sales efforts; if preliminary relief was denied, defendant "may be more firmly entrenched in the ... market by the time of trial, making permanent relief more problematical.") (internal quotations and citation omitted). The equities favor the issuance of the injunction in the instant case.

## IV. CONCLUSION

For all the reasons detailed herein, TriMark's Motion for a Preliminary Injunction (Docket No 13) is ALLOWED. Performance Food Group Company and Springfield Foodservice (collectively "Performance") are hereby enjoined from using the three-arc logo in connection with the advertising, offering for sale, or sale of its products and services until further order of the court. A hearing is scheduled for Monday, October 26, 2009 at 12:00 p.m. to address the language of the injunction and the amount of security, if any, which should be ordered under Fed.R.Civ.P.

---

**6.** Performance contends that if it were obligated to stop its renaming campaign "and cease using its PERFORMANCE FOODSERVICE mark for even a brief period of time Performance would likely have to stop that initiative entirely. This would seriously and permanently damage Performance's reputation and brand equity. Another change coming on the heels of the recent change would cause customers, vendors, and others in the foodservice industry to question Perform-

ance's stability and direction." (Sanelli Decl. ¶ 21). However, nothing herein should prevent the defendant from proceeding with its renaming to Performance Foodservice. It is simply the use of the design which is prohibited. In light of Performance's contention that the design is of minimal importance, this injunction should not cause Performance significant harm in the marketplace. It may, admittedly, however, be a financial burden to stop using the redesigned Logo.