**INDUSTRIAS WET LINE S.A.
DE C.V., et al., Plaintiffs,**

v.

**MULTY BRANDS DISTRIBUTORS,
CORP., Defendant.**

Civil No. 10–1473 FAB.

United States District Court,
D. Puerto Rico.

Signed Dec. 22, 2010.

Samuel F. Pamias–Portalatin, Aileen Edme Vazquez–Jimenez, Hoglund & Pamias, PSC, San Juan, PR, for Plaintiffs.

Carlos G. Dalmau–Ramirez, Carlos Dalmau Law Offices, Christina M. Beauchamp–Richards, Yasmin M. Santiago–Zayas, Guaynabo, PR, for Defendant.

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is plaintiff's request for a preliminary injunction, (Docket No. 7). Subsequent to an evidentiary hearing regarding that motion, both parties filed memoranda proposing findings of fact and conclusions of law to be considered by the Court. (*See* Docket Nos. 65 & 66.) Having examined the evidence presented at the hearing and the arguments contained in the parties' respective memoranda, the

Court **DENIES** the request for a preliminary injunction, (Docket No. 7).

## DISCUSSION

### I. Background

#### A. Procedural Background

On May 28, 2010, plaintiffs Industrias Wet Line S.A. de C.V. ("Wet Line"), Morales Distributors, Inc. ("MDI"), and MC Brands, Corp. ("MCB") filed a verified complaint against defendant Multy Brands Distributors Corporation ("MBD"), alleging trademark and trade dress infringement claims pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, and Puerto Rico Trademark Law, P.R. Laws Ann. tit. 10, § 171x. (Docket No. 1.) On June 2, 2010, plaintiffs filed a motion for an *ex parte* temporary restraining order ("TRO") and preliminary injunction. (Docket Nos. 7 & 8.) On the same date, the Court denied plaintiffs' motion for an *ex parte* TRO and ordered plaintiffs to serve defendants with, *inter alia*, a copy of the complaint, the motion for a TRO and preliminary injunction, and the Court's order. (Docket No. 9.)

Plaintiffs request a preliminary injunction to stop defendant from marketing and distributing a hair gel product which plaintiffs claim infringes upon their trademark and trade dress. (Docket No. 8.) On July 7, 2010, defendant filed a response in opposition to plaintiffs' request for a preliminary injunction. (Docket No. 28.) On August 3, 2010, plaintiffs filed a reply. (Docket No. 38.)

On October 12, 13, and 14, 2010, an evidentiary hearing was held, during which both parties presented evidence to the Court regarding plaintiffs' request for a preliminary injunction. (*See* Docket Nos. 55, 56, & 57.) At the conclusion of the hearing, the Court ordered the parties to file memoranda containing proposed findings of fact and conclusions of law no later than November 1, 2010. (Docket No. 64 at 111–12.) On that date, both parties complied with the Court's order and filed their respective memoranda. (*See* Docket Nos. 65 & 66.)

#### B. Factual Background

The following factual background presents basic information necessary to frame the issues in this case and is based on the evidence presented at the evidentiary injunction hearing. In its legal analysis, the Court may include further factual information derived from evidence presented at that hearing as necessary.

Luis Morales Caro ("L. Morales") is the founder and president of both MDI and MCB. Within those companies, L. Morales has approximately fifty employees. Given the workload that he carries, L. Morales delegates tasks to different supervisors for various aspects of his business, including logistics, purchasing, public relations, administration, and invoicing. In 2005, L. Morales was able to negotiate the exclusive distribution rights for the Xtreme line of hair products. This line has been distributed in Puerto Rico since October of 2003, and is manufactured by Wet Line.

Wet Line is a Mexican corporation based in Guadalajara, Mexico. Wet Line has agreements with various companies to distribute its products in different geographical locations. L. Morales is the official distributor for the island of Puerto Rico and the area of Santo Domingo in the Dominican Republic. Mexilink is another company affiliated with Wet Line, and distributes Xtreme products in Texas.

In Puerto Rico, L. Morales markets Xtreme products in numerous pharmacies, chain discount stores, grocery stores, and supermarkets. Of the many different Xtreme products sold in those locations, the thirty-five ounce container of Xtreme

Professional gel generates the highest revenue in sales. It is marketed toward a youth demographic and has a "fixation" level which can be used by most consumers. It is packaged in a transparent, octagonal jar with a label depicting the Xtreme Professional logo, which consists of the words "Xtreme Professional" in blue and white lettering in the foreground and a large green "X" with blue and white accents in the background. This particular product, sold under the product code XT63030, is marketed with both a green lid, as well as a clear lid. Wet Line owns a U.S. Trademark registration on the principal register with regard to the design of the logo, but not with regard to the color scheme. Wet Line also owns a U.S. Trademark registration on the supplemental register with regard to the shape of the container for the thirty-five ounce size of Xtreme Professional gel.

MBD distributes a competing hair gel called Super Wet, which is produced by Industrias Gane ("Gane"), which is also a Mexican corporation based in Guadalajara, Mexico. The president of MDB is Rafael Morales Caro ("R. Morales"). R. Morales is L. Morales's brother and, until leaving to start MBD in 2009, was the General Manager at MCB and MDI. As the General Manager at those companies, R. Morales was in charge of meetings, setting sales routes, supervising the sales staff, and coordinating promotions.

Within the Super Wet product line, MBD markets a thirty-five ounce container of Super Wet gel, which is geared toward the same demographic and distributed in many of the same locations as Xtreme Professional gel. Although originally marketed with a black label, the thirty-five ounce container of Super Wet gel adopted new packaging shortly after being introduced to Puerto Rico. That container is now sold in Puerto Rico in a clear, multi-sided jar with a predominantly green label

and a green lid. The label contains a Super Wet logo consisting of the words "Super Wet Natural Look" in white and blue lettering in the foreground and a green circle design with blue and white accents in the background.

## II. Legal Analysis

### A. Standard for Preliminary Injunctive Relief

When determining whether a preliminary injunction is appropriate, a "court must consider (1) the likelihood of the movant's success on the merits; (2) the anticipated incidence of irreparable harm if the injunction is denied; (3) the balance of the relevant equities (i.e., the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue); and (4) the impact, if any, of the court's action on the public interest." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir.2006) (citing *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991)). "The first factor, the plaintiff's likelihood of success, is 'the touchstone of the preliminary injunction inquiry.'" *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st cir.2008) (citing *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir.1998)). " '[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" *Id.* (citing *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir.2002)).

"The importance of [the likelihood of success] inquiry is magnified in trademark cases because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in

establishing infringement." *Borinquen Biscuit Corp.*, 443 F.3d at 115 (citing *Keds Corp. v. Renee Int'l. Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989); *Lund*, 163 F.3d at 33). "This emphasis on likelihood of success is fully consistent with the tenet that, as a matter of public policy, trademarks should be protected against infringing uses." *Id.* (citing *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 820 (1st Cir.1987)).

## B. Likelihood of Success on the Merits

### 1. Scope of the Relief Requested

Before examining substantive merits, the Court must note that plaintiffs have specifically limited the scope of the request for preliminary injunctive relief to their claims of trade dress infringement under the Lanham Act. (*See* Docket No. 65.) In their post-hearing memorandum, plaintiffs repeatedly state that they seek protection solely for the trade dress related to some of the thirty-five ounce containers of Xtreme Professional hair gel. (Docket No. 65 at 32, 44–45, 48.) Furthermore, plaintiffs present no legal arguments other than those addressing trade dress protection under the Lanham Act. *See id.* Accordingly, the Court limits its analysis to plaintiffs' likelihood of success to plaintiff's Lanham Act claim alleging trade dress infringement. .

### 2. Trade Dress Infringement

Section "43(a) of the Lanham Act, [ ] provides protection against the use of 'any word, term, name, symbol, or device' that 'is likely to cause confusion, or to cause mistake, or to deceive' as to the source of a product." *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, 259 F.3d 25, 38 (1st Cir.2001) (citing 15 U.S.C. § 1125(a)). "The Lanham Act extends protection not only to words and symbols, but also to 'trade dress,' defined as 'the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer.' " *Id.* (quoting *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir. 1997)). "The primary purpose of trade dress protection is to protect that which identifies a product's source." *Id.* (citing *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 35 (1st Cir.1998)). "Courts recognize trade dress claims based both on product packaging and on 'product design/configuration.' " *Id.* (citing *Wal–Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 213–14, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)).

"In order for trade dress to be protected under § 43(a), a plaintiff must prove that the dress is: (i) used in commerce; (ii) non-functional; and (iii) distinctive." *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, 259 F.3d 25, 38 (1st Cir.2001) (citing *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir.1998)). "Distinctiveness may be either 'inherent,' that is, the 'intrinsic nature [of the trade dress] serves to identify a particular source,' ... or 'acquired,' i.e., the trade dress has acquired a 'secondary meaning' whereby the public views its 'primary significance ... as identify[ing] the source of the product rather than the product itself.' " *Id.* (quoting *Wal–Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 213–14, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)). A plaintiff must also establish that "another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source." *Id.* (citing *Lund*, 163 F.3d at 43–44).

As illustrated below, plaintiffs have failed to show a likelihood of success as to the distinctiveness of their trade dress as well as the possibility of consumer confusion, both critical elements of a trade dress infringement claim. Their failure to do so at this stage of the proceedings precludes

preliminary injunctive relief. *See New Comm Wireless Servs., Inc.*, 287 F.3d at 9. Accordingly, their request for that relief is **DENIED.**

### 3. Distinctiveness of Plaintiffs' Trade Dress

#### a. Identification of the Trade Dress at issue

■ "[T]he burden to clearly identify the trade dress at issue is on the plaintiff." *Yankee Candle Co., Inc.*, 259 F.3d at 38 (citing *Landscape Forms v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997)). In response to defendant's contention that there is a lack of trade dress consistency over the entire range of Xtreme products marketed in Puerto Rico, plaintiffs specifically limit their claims to protection of the thirty-five ounce container of Xtreme Professional gel and describe the relevant trade dress as consisting of: "the transparent, octagonal plastic container, with a green-colored lid, [and] the label bearing the XTREME logo consisting of a letter 'X' . . . set in bright shades of the color green combined with the color white and blue . . . ." (Docket No. 65 at 32.) Although plaintiffs are free to define the trade dress for which they claim protection, it must be noted that despite gaining consistency by narrowly defining the trade dress at issue in this case, plaintiffs incur considerable difficulties in doing so. It was clearly established at the evidentiary hearing that the same product which is marketed with a green lid is also marketed with a clear lid. Both containers are sold under the same product code and there is no way to determine from the evidence thus far presented to the Court which sales may be attributed to containers with a green lid and which may be attributed to containers with a clear lid. As discussed in further detail below, the existence, and interchangeability, of the same product in a container with a clear lid significantly impairs plaintiffs' ability to demonstrate any secondary meaning acquired by the thirty-five ounce container and confusion on the part of the consumer resulting from the alleged trade dress infringement.

#### b. Inherent Distinctiveness

Plaintiffs claim that the identified trade dress is inherently distinctive for the purposes of a Lanham Act infringement claim. (Docket No. 65 at 32–33.) Their claim is supported in their post-hearing memoranda, however, only by a description of the trade dress followed by the conclusion that it is inherently distinctive. See *id.* at 32. Given the lack of supporting legal authority provided by plaintiffs and the scope of the evidence presented at the evidentiary hearings, the issue of whether the relevant trade dress is inherently distinctive is not so clear cut.

■ The traditional test for gauging the inherent distinctiveness of a trademark established in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976), involves categorizing the trademark at issue as: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Yankee Candle Co., Inc.*, 259 F.3d at 41 (citing *Lund*, 163 F.3d at 39). If the trademark is suggestive, arbitrary, or fanciful, then the product is automatically considered inherently distinctive. *Id.* If the trademark is descriptive, then distinctiveness is not presumed, but rather may be established by showing secondary meaning which has attached to the trademark in the mind of the consumer. *Lund*, 163 F.3d at 39. If the trademark is merely generic, then it cannot be distinctive for the purposes of an infringement claim under the Lanham Act. *Id.*

■ Although these categories were developed in the context of textual marks, "[t]he Supreme Court . . . has endorsed the use of the *Abercrombie* test in the

evaluation of visual marks, as well as in the assessment of product packaging trade dress claims." *Yankee Candle Co., Inc.,* 259 F.3d at 41 (citing *Lund,* 163 F.3d at 39). Due to difficulties applying that test to visual marks, however, the First Circuit Court of Appeals has "found it appropriate to supplement the somewhat bareboned *Abercrombie* categories with the questions asked in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.,* 568 F.2d 1342 (C.C.P.A.1977)." *Id.* "In *Seabrook,* inherent distinctiveness was determined by reference to: (i) whether the design was a common or a basic one; (ii) whether it was 'unique or unusual' in the field; (iii) whether it was a refinement of a common form of ornamentation; and (iv) 'whether it was capable of creating a commercial impression distinct from the accompanying words.'" *Id.* at 42. " 'In reality, all three [*Seabrook*] questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin a trademark.'" *Lund,* 163 F.3d at 40 (quoting 1 McCarthy § 8:13).

Although the Supreme Court has stated that "the very purpose of ... encasing [a product] in a distinctive packaging, is most often to identify the source of the product," *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 212, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), determining the distinctiveness of a trade dress is a case-specific process dependent on particular factual circumstances. *See Lund,* 163 F.3d at 39. This is especially so given the First Circuit Court of Appeals' continued application of the *Seabrook* questions, which largely rely on a court's assessment of the uniqueness of a trade dress in the context of similar products in the relevant market. *See id.* at 40. It is this emphasis on particular factual circumstances that leaves the Court without foundation to conclude that plaintiffs are likely to establish the inherent distinctiveness of their claimed trade dress.

The only evidence presented by plaintiffs regarding the peculiarity of their identified trade dress is the testimony of L. Morales, in which he generally stated that the container and packaging was unlike that of other, similar products at the time the thirty-five ounce container of Xtreme Professional gel was introduced to the Puerto Rico market. (*See* Docket No. 62 at 64, 69–70.) Defendant, on the other hand, introduced several exhibits suggesting that the use of a predominantly green trade dress is not uncommon in the range of hair gel products sold in Puerto Rico. (*See* Defendant's Exhibits I–2 to I–7.) This being the extent of the evidence presented with regard to the various trade dresses used by similar products in Puerto Rico, the Court cannot apply properly the *Seabrook* questions and cannot fairly determine that plaintiffs are likely to prove that their trade dress is so peculiar in the Puerto Rico hair gel market that it is inherently distinctive. Thus, the Court proceeds to consider whether plaintiffs have shown sufficient evidence of secondary meaning to merit preliminary injunctive relief.

### c. Secondary Meaning

"Proof of secondary meaning entails vigorous evidentiary requirements." *Yankee Candle Co., Inc.,* 259 F.3d at 43 (quoting *Boston Beer Co., LP v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir.1993)). "The only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers." *Id.* "Although survey evidence is not required, 'it is a valuable method of showing secondary meaning.'" *Id.* (citing *Lund,* 163 F.3d at 42.) Plaintiffs have presented neither of those forms of evi-

dence in support of their request for a preliminary injunction.

■ "Secondary meaning may also be proven through circumstantial evidence, specifically the length and manner of the use of the trade dress, the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source." *Id.* (citing *Boston Beer,* 9 F.3d at 182). "Other factors may include the product's 'established place in the market' and proof of intentional copying." *Id.* (citing *Lund,* 163 F.3d at 42). Although plaintiff has presented, and alludes to, circumstantial evidence of this nature, the Court finds that the evidence does not clearly establish secondary meaning or "demonstrat[e] a conscious connection between the claimed trade dress and the product's source." *See id.* at 44.

In their post-hearing memorandum, plaintiffs present three arguments in support of finding that their trade dress has acquired secondary meaning. First, they argue that "[t]he Xtreme Professional product in controversy has been consistently and continuously sold in . . . Puerto Rico . . . using the same packaging since 2003 and throughout the years millions of units of this product have been sold . . . in Puerto Rico alone." (Docket No. 65 at 34.) This argument is severely undercut, however, by the evidence that the same product, the thirty-five ounce container of Xtreme Professional gel, is also sold under a different trade dress which uses a clear lid rather than a green lid. As admitted by L. Morales, there is no way of distinguishing the sales of the product with the green lid from those of the product with the clear lid based on the documents and testimony presented at the evidentiary hearing. Furthermore, R. Morales testified that, during his employment with MDI and MCB, he was not aware of the sale of a thirty-five ounce container of Xtreme Professional gel sold with a green lid, other than those containing toys and prizes, which were sold under a different product code. It was his testimony that the ordinary thirty-five ounce container of Xtreme Professional gel was sold only with a clear lid. Given the conflicting evidence regarding the length and manner of the use of the trade dress identified by plaintiffs in this case, it cannot be fairly said that the cited evidence clearly supports the existence of any secondary meaning in the mind of the consumer.

Even if plaintiffs had shown voluminous, longstanding sales specifically with regard to the trade dress identified in this case, "pervasiveness of the trade dress," is insufficient on its own, to "support the conclusion that a mark has acquired secondary meaning . . . ." *See Yankee Candle Co., Inc.,* 259 F.3d at 44. "To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product" in a manner inconsistent with "the 'vigorous' evidentiary showing" required to establish secondary meaning and "the purposes of trade dress protection." *Id.* The First Circuit Court of Appeals has held that "[i]n the absence of *any* evidence that he claimed trade dress actually *does* identify a product's source, the trade dress should not be entitled to protection." *Id.*

■ Plaintiffs next rely on evidence of newspaper advertising and other promotion campaigns carried out by MDI and MCB. (*See* Docket No. 65 at 34.) "To be probative of secondary meaning, . . . advertising must direct the consumer to those features claimed as trade dress. Merely 'featuring' the relevant aspect of the product in advertising is no more probative of secondary meaning than are strong sales; again, to provide protection based on extensive advertising would ex-

tend trade dress protection to the label (or to the combination claim) without any showing that the consumer associated the dress with the product's source." *Yankee Candle Co., Inc.,* 259 F.3d at 38 (citing *Int'l. Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 824 (9th Cir.1993)). None of the newspaper advertising presented by plaintiffs "specifically directs" consumers to any of the aspects identified in plaintiffs' description of the trade dress at issue in this case. *See id.* Although some of the advertising features a depiction of a thirty-five ounce container of Xtreme Professional gel, it does so alongside numerous other Xtreme products and even only shows the container with a clear lid, not the green lid included in the trade dress identified by plaintiffs. (*See* Joint Exhibit XX.)

With regard to promotional events, the evidence presented by plaintiffs shows that MDI and MCB sponsored several events related to summer festivals and athletic events. Plaintiffs introduced several photographs of those events illustrating the use of the color green in the decorations as well as the uniforms worn by models employed by MDI and MCB. (*See* Plaintiffs' Exhibits 3A–3I.) Although this evidence does demonstrate promotion of the green color used in the trade dress claimed by plaintiffs, it does not show promotion of any of the other aspects of that trade dress. Nor does this evidence provide any indication that consumers actually associated the color green, or any other aspect of the specific trade dress claimed, with the particular product, i.e., the thirty-five ounce container of Xtreme Professional gel with a green lid. Given that neither the newspaper advertising nor the promotional events specifically point consumers to the trade dress identified by plaintiffs in this case, the evidence of that advertising and promotion is not particularly probative of secondary meaning.

Lastly, plaintiffs argue that secondary meaning is also established by evidence that defendant intentionally copied the trade dress at issue in this case. (Docket No. 65 at 43.) Plaintiffs support this argument solely by pointing to the fact that R. Morales was formerly employed by MDI and MCB. Without any further evidence, however, R. Morales's past employment by MDI and MCB does not necessarily indicate that the adoption of Super Wet's current trade dress was done with the intention to "pass off" the Super Wet product as an Xtreme Professional product. *See Yankee Candle Co., Inc.,* 259 F.3d at 45.

On the contrary, defendant presented the testimony of Carlos A. Monroig ("Mr. Monroig"), the general director of Industrias Gane, which manufactures the Super Wet Line of products. Mr. Monroig testified that R. Morales had no input in the development of the contested trade dress used on the Super Wet container. He stated that the contested trade dress was independently developed by Industrias Gane. Mr. Monroig further testified that the use of the color green in the particular trade dress at issue refers the use of aloe vera as an ingredient in the hair gel. He stated that an alternate, predominantly red trade dress is used for a similar product sold in the same container that includes a different ingredient, called "jojoba." Given this evidence of the functional nature and independent design of the predominantly green trade dress at issue in this case, there does not appear to be much evidentiary support, as of yet, for plaintiffs' contention that any similarities between the two trade dresses are the result of intentional copying.

Although plaintiffs have presented "some of the circumstantial evidence often used to support ... a finding" of secondary meaning, the majority of that evidence is not specifically geared toward the

Xtreme Professional trade dress at issue, but rather generally applies to the entire Xtreme product line. Plaintiffs' evidence also fails to show "that actual consumers associated the claimed trade dress with [Xtreme] ... [or] confusion on the part of actual consumers." *See Yankee Candle Co., Inc.,* 259 F.3d at 38. Defendant's introduction of evidence regarding the intent behind the adoption of the Super Wet product's trade dress and the alternate Xtreme Professional trade dress further undermines a finding of secondary meaning for the particular trade dress claimed by plaintiffs in this case. Given the lack of any direct evidence or sufficient circumstantial evidence, it does not appear that, at this stage of the proceedings, plaintiffs have established a likelihood that they will succeed in proving that the thirty-five ounce container of Xtreme Professional gel with a green lid has acquired secondary meaning.

#### 4. Consumer Confusion

█ Even if plaintiffs had presented sufficient evidence to demonstrate a likelihood of success in establishing a distinctive trade dress for the purposes of infringement under the Lanham Act, they would still need to show a likelihood of consumer confusion in order to satisfy the first prerequisite to preliminary injunctive relief. *See Lund,* 163 F.3d at 43–44. In determining whether there is a likelihood of consumer confusion resulting from defendant's use of a similar trade dress, the Court relies on the eight-factor test established in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981). Under that test, "a court should examine the following factors: 'the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendant's intent in adopting its mark; and the

strength of the plaintiff's mark.'" *Boston Duck Tours,* 531 F.3d at 10 n. 6 (citing *Pignons,* 657 F.2d at 487). Although it is true that there is a similarity in the color schemes between the parties' containers, as discussed in detail below, the majority of the factors listed above do not weigh heavily in favor of finding a likelihood of consumer confusion based on the evidence presented to the Court thus far. Plaintiffs' failure to present sufficient evidence to turn these factors in their favor further precludes the finding of likelihood of success on the merits necessary to invoke preliminary injunctive relief.

##### a. Similarity of the Trade Dresses

█ "'[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features.'" *Boston Athletic Ass'n. v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989) (quoting *Volkswagenwerk,* 814 F.2d at 817). Although there is a similarity between the color scheme used in the trade dress in both products, differences in the use of the color scheme, the shape of the products' respective containers, and their respective logos, undermine the possibility of confusion of the two products by customers.

The primary similarity between the two trade dresses in question is the color scheme. Both containers have a green lid and use the color green in the background of the logos and labels. Both containers also use the colors blue and white in the lettering of their logos, with Xtreme Professional using blue letters outlined in white and Super Wet using white letters outlined in blue. Although the color scheme is similar, the use of that color scheme differs between the containers. The Xtreme Professional container uses a much smaller label, confining the green background to the large "X" in the Xtreme Professional logo. The Super Wet con-

tainer employs a label which wraps around the entire container and uses the green color throughout the background. Thus, the features of their labels make the Xtreme Professional container predominantly transparent and the Super Wet container predominantly green.

Also differentiating the two products, the shapes of the containers and their respective lids are not overwhelmingly similar. Although both come in jars with angled sides, Xtreme Professional's thirty-five ounce container is octagonal and keeps that shape from the bottom of the container up to its circular lid. The lid itself bears a well-defined, highly-raised Xtreme Professional logo and a handle also containing a miniature "X" at the top. Super Wet's similarly-sized container is slightly taller and has twelve sides. The angular aspects of the Super Wet container, however, are confined to the top and bottom of the container. The middle portion of the container is round and embossed with several Super Wet logos. The lid of Super Wet's container is also embossed with a Super Wet logo, but that logo is not highly-raised. The Super Wet container's lid does not have a handle similar to that attached to the Xtreme Professional container.

Further limiting the danger of confusing any similar aspects of the two trade dresses is the prominent use of product names and logos on both Super Wet and Xtreme Professional's containers. "It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983); *see also TriMark USA, Inc. v. Performance Food Group Co.*, 667 F.Supp.2d 155, 162 (D.Mass.2009). Xtreme Professional's container uses a label which primarily consists

of the Xtreme Professional name and logo, and also includes a well-defined version of its logo on its lid. Super Wet likewise features a label with the product's name in large print and its logo, as well as three embossed Super Wet logos on its sides and one embossed Super Wet logo on its lid. Given the heavy use of their respective names and logos by both products, the mere similarity of the color scheme seems even less likely to cause any actual confusion with hair gel consumers.

### b. Similarity of the Goods

There is no dispute in this case that the relevant goods are both transparent hair gels with little apparent difference. Thus, this factor weighs in favor of a likelihood of consumer confusion.

### c. Relationships Between the Parties' Channels of Trade and Advertising; Classes of Prospective Purchasers

These three factors are considered together as a matter of practice in the First Circuit. *See Aktiebolaget Electrolux v. Armatron Int'l., Inc.*, 999 F.2d 1, 3 n. 3 (1st Cir.1993). The relationship between the parties' channels of trade and the class of prospective purchasers for both products weigh in favor of finding a likelihood of consumer confusion. From the evidence presented at the preliminary injunction hearing, it appears that both Xtreme Professional and Super Wet are sold in close proximity in the same pharmacies, chain discount stores, and grocery stores. Furthermore, neither party contests that both products are sold to the same class of prospective purchasers.

The relationship between the parties advertising, however, does not support such a finding. The only evidence of advertising presented at the hearing was related to the Xtreme Professional product. No evidence was presented to demonstrate that there is any relationship between Super

Wet advertising with Xtreme Professional advertising.

#### d. Evidence of Actual Confusion

While not required to find a likelihood of confusion, "evidence of actual confusion is 'often deemed the best evidence of possible future confusion....'" *Borinquen Biscuit,* 443 F.3d at 120 (quoting *Attrezzi, LLC v. Maytag Corp.,* 436 F.3d 32, 40 (1st Cir.2006)). In this case, plaintiffs have not presented any evidence of actual consumer confusion to support a finding that consumer confusion is likely.

#### e. Defendant's Intent in Adopting the Trade Dress

"Whether the defendant acted in bad faith in adopting its mark is another factor to be considered in determining the likelihood of consumer confusion." *Boston Duck Tours,* 531 F.3d at 25–26 (citing *Attrezzi,* 436 F.3d at 40). As described above, there is conflicting evidence regarding defendant's intent in adopting the contested trade dress for Super Wet gel in Puerto Rico. Although R. Morales was formerly employed at both MDI and MCB, plaintiffs presented no additional evidence to suggest bad faith behind the adoption of the trade dress at issue. Defendant presented testimony from Mr. Monroig that Super Wet's predominantly green trade dress was independently designed by the manufacturer with no involvement by R. Morales in conjunction with alternate, predominantly red trade dress. Mr Monroig further testified that the green trade dress alludes to the use of aloe vera, while the red trade dress alludes to the use of a different ingredient, "jojoba." Mr. Monroig also stated that the shape of the container used for the Super Wet product has always been the same, even before the adoption of the new color scheme. In light of the lack of evidence presented by plaintiff and Mr. Monroig's testimony regarding the development of the contested trade dress, the Court cannot conclude, based on the evidence presented at the hearing, that it is likely that bad faith was involved in Super Wet's adoption of that trade dress. Thus, at this stage of the proceedings, nothing regarding defendant's intent supports a finding that consumer confusion is likely.

#### f. Strength of Plaintiff's Mark

Although plaintiffs trumpet the uniqueness of the trade dress they describe for the thirty-five ounce container of Xtreme Professional gel in their post-hearing memorandum, their arguments regarding the strength of that trade dress suffer from the same defects addressed in the Court's analysis of inherent distinctiveness. Plaintiffs introduced little evidence to compare their trade dress to others in the market and defendant introduced several exhibits demonstrating that other hair products in the Puerto Rico market use the color green in their respective trade dresses. Furthermore, as noted above, the product for which plaintiffs claim protection under the Lanham Act is sold under two different trade dresses, the sales of which cannot be differentiated based on the evidence presented at the evidentiary hearing. Both the lack of comparative market evidence and the existence of an alternate trade dress severely undermine plaintiffs' arguments regarding the strength of the trade dress ascribed by plaintiffs to the thirty-five ounce container of Xtreme Professional gel in their post hearing memorandum.

#### C. Remaining Preliminary Injunction Factors

Given that plaintiffs have failed to show a likelihood of success on the merits as to any of the required elements of a trade dress infringement claim, they cannot succeed on their request for a preliminary injunction based on that claim. *See New Comm Wireless Servs., Inc.,* 287 F.3d at 9.

This is especially so due to the increased importance of that factor in cases of trademark infringement. *Borinquen Biscuit Corp.*, 443 F.3d at 115. Accordingly, the Court need not consider the remaining factors of the preliminary injunction standard.

## CONCLUSION

For the reasons described above, the request for a preliminary injunction, (Docket No. 7), is **DENIED.**

**IT IS SO ORDERED.**